UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                  CRIMINAL NO. 16-cr-20007

v.                              HON. VICTORIA A. ROBERTS

DAMIAN NOWICKI,

      Defendant.

_____/

**Government's Sentencing Memorandum**

      Respectfully submitted,

      BARBARA L. MCQUADE
      United States Attorney

      s/ *Margaret M. Smith*
      Deputy Chief, General Crimes Unit
      Assistant United States Attorney
      211 W. Fort Street, Suite 2001
      Detroit, MI  48226
      Phone: (313) 226-9135
      E-Mail: margaret.smith@usdoj.gov
      Bar No. P71413

Dated:  September 16, 2016

## Table of Contents

Table of Authorities ........................................................................................ iii

I.   Facts and Procedural History .......................................................................1

     A.   Investigation .........................................................................................1

     B.   Search warrant and admissions ...........................................................2

     C.   Forensic review of media ....................................................................3

          1.   Child pornography obtained and traded online .........................3

          2.   Producing child pornography by online enticement ..................4

          3.   Producing child pornography by sexual assault ........................5

     D.   Plea agreement .....................................................................................6

II.  The factors under 18 U.S.C. § 3553(a) warrant a 480-month sentence. .........7

     A.   Sentencing guidelines and Congressional factors ...............................7

          1.   The Report's suggestions would increase Nowicki's
               guideline range for the distribution count ...................................9

          2.   Nowicki's suggestions do nothing to change the
               production count calculations. ................................................10

     B.   The nature and circumstances of the offense .....................................11

          1.   Producing child pornography with MV-3 ................................11

          2.   Distributing child pornography .................................................11

     C.   History and characteristics of the defendant .....................................12

D.      Seriousness of the offense, promotion of respect for the law, and just punishment for the offense ............................................................... 13

E.      Adequate deterrence and protection of the public .............................. 17

F.      Kinds of sentences available and the need to avoid unwarranted sentencing disparities. ......................................................... 17

III.    Conclusion ........................................................................................ 18

# Table of Authorities

## Cases

*In re Amy Unknown*, 636 F.3d 190 (5th Cir. 2011) ...................................................14

*New York v. Ferber*, 458 U.S. 747 (1982) .................................................................16

*Osborne v. Ohio*, 495 U.S. 103 (1990) ......................................................................14

*United States v. McNerney*, 632 F.3d 772 (6th Cir. 2011) ........................................7

*United States v. Miller*, 665 F.3d 114 (5th Cir. 2011) ..............................................16

*United States v. Norris*, 159 F.3d 926 (5th Cir. 1998)..............................................14

*United States v. Rita*, 551 U.S. 338 (2007)................................................................7

*United States v. Vowell*, 516 F.3d 503 (6th Cir. 2008)..............................................1

## Statutes

18 U.S.C. § 2251(a) ....................................................................................................1

18 U.S.C. § 2252A(a)(2) .............................................................................................1

18 U.S.C. § 3553(a) ................................................................................................1, 7

## Other Authorities

Sentencing Commission Report issued in 2012 ................................................ 8–10

USSC 2009 History of the Child Pornography Guidelines Report ..........................8

**Guidelines**

USSG § 2G2.2..................................................................................7, 8

USSG § 4B1.5.....................................................................................11

**Government's Sentencing Memorandum**

Defendant Damian Nowicki stands convicted of producing and distributing child pornography, in violation of 18 U.S.C. §§ 2251(a); and 2252A(a)(2) For the reasons stated in this memorandum, the government believes a sentence of **480 months' imprisonment** is "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008).

## I.    Facts and Procedural History

### A.    Investigation

The defendant came to the attention of law enforcement through his participation in an online chat group on the KIK application.  Using the name "omenii01," Nowicki posted sexually explicit images in the group, "0 to 5 years (share to stay)."  One of the images posted by Nowicki depicted a naked prepubescent female child sitting on what appears to be a toilet in a bathroom.  An adult male penis can be seen in the image in close proximity to the child's face.  The child's two hands are holding the adult male penis.  The child's eyes are closed and she has a white substance on her face that appears to be semen.  An adult male hand is grasping the child's head by the hair.   Law enforcement tracked Nowicki's internet protocol address back to his home and executed a search warrant.

**B.     Search warrant and admissions**

Nowicki admitted to having a sexual interest in little girls, between the ages of seven and ten.  He would search online for "baby" and "tiny" child pornography. Nowicki further admitted to receiving sexually explicit images from at least six to eight underage girls online.  He confessed that he masturbated to child pornography one to two times per week.

Agents also found girls' underwear in Nowicki's room, which he claimed belonged to a teenage niece, but he admitted to using them to sexually gratify himself.  They also located an item of children's jewelry.  Nowicki said it belonged to MV-4, an eight-year-old relative of his roommate.[1]

Nowicki took, and failed, a polygraph exam that centered on whether he ever made sexual contact with a child.  He discussed with the agents how he enjoyed "tickling" MV-4, and was known as the "tickle monster" by her and several other children at the local American Legion where he visits.  Nowicki admitted to taking several pictures of a young girl (not MV-4) when her underwear was exposed while wearing a skirt at the American Legion.

Going back to MV-4, Nowicki confessed that he has kissed this 8-year-old child on at least three occasions, but the most memorable time occurred when they

---

[1] This child is not named in the First Superseding Indictment.  In order to avoid confusion with the minors charged in this case, she has been referred to as Minor Victim Four (MV-4) in this memorandum.

traveled together to Virginia.  Nowicki described it like a boyfriend/girlfriend kiss. She sat on his lap, alone with him, in a recreational vehicle.  Nowicki further confessed that he and this child slept in the same bed together on several occasions. He said that one time, MV-4 urinated on him while they were alone in the camper. He told agents that he believed it was possible for an 8-year-old and an adult of his age to engage in a consensual relationship, and that he loved MV-4.  In fact, the children's jewelry found in Nowicki's home was to be a gift to MV-4 from Nowicki.

### C.    Forensic review of media

During the course of the forensic review of Nowicki's media, agents discovered three different types of child pornography: (1) child pornography that Nowicki obtained from the internet and traded; (2) child pornography that Nowicki enticed children to make for him online by chatting with them; and (3) child pornography that Nowicki produced through the sexual assault of a small child.

### 1.    Child pornography obtained and traded online

Nowicki downloaded and saved thousands of images and videos of child pornography.  His huge collection of child pornography obtained from the internet included graphic, disgusting, and horrific depictions of the sexual assault of children. The vast majority of the collection show young children who are clearly prepubescent.  They are extremely slight in stature; have no real body development; and no visible body hair.  Some of the children are clearly babies.  In the images,

these young girls are posed either fully nude, or scantily clad in inappropriate attire given their tender years, often reclining on beds or on chairs. They are forced to pose in unnatural ways given their young ages, all to create the false and devastating impression that they are willing to engage in sexual activity. Some of these children are so small – toddler and preschool age – that an adult man's penis penetrating them is physically impossible. But that does not stop them from trying to do so in the videos and images.

### 2.    Producing child pornography by online enticement

Nowicki's cell phone contained over 2,000 sets of chat messages. Many of the messages from KIK were between Nowicki and underage girls (or people he thought were underage girls). Anxiously, Nowicki worked to get the girls to send sexually explicit images to him. And often, it worked. Nowicki knew just what to say to make the girls feel special. For example, when a child would indicate, "Do u like I'm 15," Nowicki responded, "Yes I do. How did you get to be so cute?" Nowicki complimented the children often, telling the girls they were pretty and that he loved them. Then, he would ask for pictures. For example, "do you have a cute photo of you I can cherish?" Nowicki would turn the conversations sexual, telling the girls frequently that he was sending, "kisses licks hugs and cuddles." He asked the girls to call him "Daddy," and he called them "baby."

4

MV-1 was a sixteen-year-old child that communicated with Nowicki.[2] MV-1 was interviewed, and acknowledged that Nowicki sought out, and she sent, sexually explicit images. In those conversations, Nowicki was very graphic, playing a "phone sex" of sorts over the texting, while encouraging MV-1 to send images: "Making daddy happy. As I push the head of my cock into your soft warm pussy." These conversations carried on at all hours of the day with this child. Sometimes, she even sent him pictures while she was in her school cafeteria.

### 3.   Producing child pornography by sexual assault

Some of the KIK chats recovered showed conversations Nowicki had with like-minded pedophiles. In one of those chats, Nowicki bragged that his "first unexpected experience of young love was with my girlfriend's daughter." He explained that the child, "started to slowly rock back and forth grinding my crotch. She made me excited . . . she made me cum in my pants . . . ." Nowicki said the girl was Asian, and explained that he wanted to have sex with her. He said that he and his girlfriend slept naked together, and the little girl would climb in bed with them at night. Nowicki claimed in the chat that the girl "started to play with [my penis] and stroke it." Over the course of 38 pages, Nowicki described the sexual abuse of

---

[2] This is the same MV-1 from Count 1of the First Superseding Indictment. (In the Rule 11 plea agreement, the parties erroneously listed MV-3 as MV-1, though the identity of the child was correctly described).

this child in detail.  He provided an image of the girl, and it is one of the same girls in the batch of images that are described below.

As part of the forensic review of this case, agents located several images of two Asian girls that contained geo-location data demonstrating the images were taken in Ypsilanti, Michigan.  In one image, a girl is laying on Nowicki's chest in a bed, and a younger girl is seen sitting on the bed in the background.  In three images, MV-3, who was approximately six years old at the time, is sitting with her legs spread, wearing only her underwear and socks.[3]  Nowicki's penis can be seen touching the front of her underwear, at her vaginal area.  MV-3 has her hand on the penis.  They are three distinct images, likely taken in succession.

### D.    Plea agreement

On May 4, 2016, the defendant pleaded guilty to one count of producing child pornography with MV-3 and one count distribution of child pornography, with the protection of a Rule 11 plea agreement.  The PSR calculated a guideline range of life, based on an offense level 43, criminal history I.[4]  The defendant filed objections to the PSR, but never served them on the government; however, the government agrees with the probation department's position, as stated in its addendum.

This Court set sentencing for October 4, 2016.

---

[3] This is the child named in Count 9 of the First Superseding Indictment.
[4] Nowicki's actual offense level totaled 46, but was adjusted to 43 under Chapter 5, Part A, comment n.2.

## II.    The factors under 18 U.S.C. § 3553(a) warrant a 480-month sentence.

The Supreme Court has noted that, in formulating the sentencing guidelines, the U.S. Sentencing Commission's goal is to carry out the objectives of 18 U.S.C. § 3553(a).  *United States v. Rita*, 551 U.S. 338 (2007).  While advisory, the Guidelines remain an important factor in fashioning a just sentence.  This is because "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  *Id.* at 350.  Thus, the starting point is undisputed: it is life in prison.

### A.    Sentencing guidelines and Congressional factors

This Court is well-aware of the arguments the government has previously made regarding the appropriateness of the guidelines in child pornography cases. This case is a bit different, however, because the defendant has pleaded to both a production of child pornography count, which is not the subject of debate, and distribution of child pornography, which generally receives the brunt of the arguments regarding guideline calculations.

And the Sixth Circuit has noted that the guidelines come armed with something stronger than the examination of the Sentencing Commission: the will of Congress.  "Congress has taken an active role" in crafting USSG § 2G2.2.  *United States v. McNerney*, 632 F.3d 772, 775 (6th Cir. 2011).

Nowicki argues that certain enhancements applied to his case are routinely applied in every case, and therefore, should be eliminated from the calculation. But Nowicki's request mischaracterizes the U.S. Sentencing Commission's conclusions on the current guidelines.

The 2012 Commission report is merely a starting point for reevaluating the guidelines. Congress has yet to provide any indication of its views regarding the recommendations—four years later, including whether any particular enhancement should be eliminated. Moreover, cherry-picking a certain enhancement without considering its relationship to the rest of the guidelines is also inappropriate. Indeed, the base offense level under § 2G2.2 was *purposefully set lower* to account for the frequent application of certain enhancements, including the use of a computer. *See* USSC 2009 History of the Child Pornography Guidelines Report, at 44–47.

Nowicki's citation to the "Use of Guidelines and Specific Offense Characteristics in 2015" data is unhelpful. It is unclear where the reasoning originated that, if an enhancement applies to a majority percentage of child pornography cases, it ought to be outright eliminated from the guideline calculations, but if that were the case, the following enhancements would never be counted in any offense:

- Physical contact in obstruction of justice (2A2.4(b)(1)(a)) – 75.1%

- Use of dangerous weapon in kidnaping (2A4.1(b)(3)) – 69.9%

- Stealing less than $10,000 in robbery (2B3.1(b)(7)(A)) – 79.4%

- Making more than one bribe (2C1.1(b)(1)) – 70.4%

- Making more than one gratuity (2C1.2(b)(1)) – 89.5%

- Offense under color of law (2H1.1(b)(1)(B)) – 71.4%

- Noncompetitive price bids (2R1.1(b)(1)) – 100%

- Money laundering convictions under § 1956 (2S1.1(b)(2)(B)) – 77.5%

Defense Exhibit A.

### 1.   The Report's suggestions would increase Nowicki's guideline range for the distribution count

Suggesting that the Court simply discount the guidelines for enhancements that are currently applied to many cases fails to account for the Commission's suggestions that if those other enhancements are eliminated, the following should be changed: the base offense levels may increase, and/or additional enhancements may be added for: (1) content of the images/videos, age of the victims, organization of collection; (2) degree of offender's engagement with other offenders; and (3) history of engaging in sexually abusive conduct. *See* Commission Report at p. 320. Following defendant's logic, it follows that if the Court eliminated the more commonly used enhancements, then it ought to account for the likely new enhancements to come in the future: (1) content of images (his collection included graphic depictions); and age of the victims (his collection included babies) (2)

9

engagement with other offenders (he communicated with like-minded individuals and traded child pornography online); and (3) his history engaging in sexually abusive conduct (he has a history of sexual contact with multiple victims).

Indeed, the Sentencing Commission Report explicitly stated that "presence of aggravating factors from **any** of these three categories . . . warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case." *Id.* at 321. Where, as here, "[t]he presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category." *Id.*

While the Sentencing Commission Report issued in 2012, and Congress has obviously been fully aware of the report, the guidelines have remained in place, with the appropriate enhancements. Unless and until Congress decides to change them, they are still the starting point for any discussion on an appropriate sentence. And Nowicki has presented to this court nothing that should move him outside the heartland of cases for which the guidelines intended to capture.

### 2. Nowicki's suggestions do nothing to change the production count calculations.

Nowicki's suggestion that if the Court eliminated the (+2) for use of a computer and the (+5) for the number of images, he would have a guideline range of 188–235 months is simply wrong. Count 9 carries an offense level of 38. The production of child pornography count does not contain the enhancements Nowicki

seeks the Court to ignore. Count 6, with Nowicki's suggested deductions, would carry an offense level of 35. The counts do not group, so an additional (+2) is added, for a combined adjusted level of 40. Because Nowicki qualifies under the dangerous sex offender provision (4B1.5), an additional (+5) is added, for an offense level of 45. Subtracting (-3) for acceptance of responsibility, his adjusted guideline range would be 42, criminal history category I, or 360–life.

The government's recommended sentence of 480 months' imprisonment still fits squarely within the range the defendant suggests to this Court.

### B.   The nature and circumstances of the offense

#### 1.   Producing child pornography with MV-3

This defendant repeatedly took advantage of his girlfriend's small child by sexually assaulting her, then taking photographs of it. She was very small, and by the chats recovered on Nowicki's phone, in his own words, he described multiple instances of sexual abuse. Worse, Nowicki described it as consensual, and even aggressive on the part of this small child, a classic rationalization technique on the part of an individual with a sexual interest in children.

#### 2.   Distributing child pornography

To be clear: this defendant appears for sentencing on two separate crimes. Not only did he record himself sexually assaulting a small child, but he also engaged in trading graphic and disturbing child pornography online with others. These videos

and images depict the horrific abuse of small children that would repulse most people. But not Nowicki; these images and videos were sought out, traded, and saved, so defendant could access them for his sexual pleasure over and over again.

With a click of the button on a camera, the sexual abuse of these children is memorialized forever. Worse, the crimes against them continue over and over again, because every time their image is collected, every time Nowicki views their abuse to whet his sexual appetite, these children are victimized all over again. Not only must these children deal with the physical, psychological, and emotional repercussions of their abuse, but they—unlike those children whose victimization was not memorialized on film—know that thousands of people watch, download, and trade in their suffering.

### C.   History and characteristics of the defendant

This defendant's behavior supports the imposition of a 40-year sentence because he has a demonstrated desire in very small children, has acted on his sexual urges multiple times, and remains undeterred from seeking out and fulfilling his sexual desires aimed at little girls.

What do we know about Nowicki? His sentencing memo focused mostly on the hardships of incarceration and the United States Sentencing Guidelines. He was raised in a home without abuse or neglect, a privilege many defendants facing this Court cannot claim.

12

What we do know about the defendant is that he has a strong sexual desire for children. He takes every opportunity to surround himself with little girls, from getting close to his roommate's relative (MV-4), to the children at the American Legion who refer to him as "tickle monster," to the girls he scours the internet to find. We know that he acts on his sexual urges, in many ways. First, he acts on them by collecting images and videos of their sexual abuse and masturbating to the material, at least once or twice a week. He searches for "baby" child pornography online. He saves the images and videos so that he can come back later and review the material. Second, he reaches out to the community of child pornographers to trade materials, offering up materials on his side with the expectation of materials on the other side. Third, he finds little girls online and invites them into his world by chatting with them, grooming them by offering compliments and winky faces. He works hard to lower their inhabitations by calling them beautiful and sexy. Then, he moves in to satisfy himself sexually by seeking their graphic images. Fourth, when the opportunity arises, he makes sexual contact with small children, the pattern showing young girls, perhaps too young to tell, or fight back, or know how to resist.

How many more children must be abused before this man is stopped?

### D.   Seriousness of the offense, promotion of respect for the law, and just punishment for the offense

Defendant's convictions involve two separate and distinct harms: first, to MV-3; but second, to all the children victimized in his child pornography collection that

13

he downloaded, traded and saved.  The damage done to MV-3 is permanent. Undoubtedly, it is a serious offense.  And so is the distribution of all of images and videos that Nowicki collected.  It is not simply a "consumer crime" without victims. Congress has made it clear that child pornography offenses directly harm children. And courts across the country recognize the seriousness of the offense:

> [t]he consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in those materials to suffer as a result of his actions in at least three ways.  First, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials . . . .
>
> Second, the mere existence of child pornography represents an invasion of the privacy of the child depicted.  Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young . . . .
>
> Third, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials . . . .  Any of these effects, stemming directly from a consumer's receipt of or willingness to receive child pornography, would amply justify the conclusion that a child depicted in the pornographic images was a 'victim' of that crime.

*In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998).  People like Nowicki, who scour the internet searching for images and videos showing children being forced to participate in sexual acts "create[] a market for the abuse [of children] by providing an economic motive for creating and distributing the materials." *Osborne v. Ohio*, 495 U.S. 103,

14

110 (1990).   The Supreme Court recognizes that the government "will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." *Id.* at 109–110.

The evidence in Nowicki's media alone demonstrates that producers are driven by receivers and possessors.  This is not a marketplace where the currency is necessarily cash; rather, oftentimes, the currency is the sexual excitement provided to both the producer and the consumer by deriving sexual excitement from the rape of little children.  If the people who search specific terms on the internet for specific types of child pornography are not driving the market, then why is it that titles of child pornography files serve as enticing advertisements for the newest, most daring, and explicit images/videos? Child pornography often includes titles with "!!! NEW !!!" or "brand new!" or "AWESOME."  Why do the videos often contain messages at the beginning or end that state, "want more? Email me at ....".  Why do producers of child pornography list their websites like banner advertisements in their videos and images?  And why do some producers label their "series" images/videos by number to prove they are making "original" material?  It is because Nowicki, and others like him, drive a market that feeds on sexual excitement through torture and humiliation of little children.  So long as there is an audience, there will be a demand for child pornography.

15

Children are molested, raped, and tortured every day around the world, and people like Nowicki collect the images of that suffering for their own sexual gratification. And when those images of suffering are obtained, the collectors of child pornography want more. What results is the continued exploitation of children. In *United States v. Miller*, 665 F.3d 114, 123 (5th Cir. 2011), the Fifth Circuit called it:

> an undeniable fact that real children are being abused and violated when pornographic images are made. Without a market for such images, and without a strong appetite for more and more images exhibited by [defendant] and similarly situated defendants, there would be far fewer children who are injured and criminally assaulted in this way. If a handful of pornographic images taken twenty years ago were sufficient to satisfy the perverse desires of those who possess and traffic in child pornography, we would not have the huge industry that exists internationally today.

Has Nowicki distributed MV-3's abuse? The answer to that question, unfortunately, is that we do not yet know. To be sure, as of this writing, the images of MV-3 are still in the process of being reviewed by the National Center for Missing and Exploited Children.

A sentence that would adequately reflect the seriousness of the offense would recognize that Nowicki collected images and videos that were "intrinsically related to the sexual abuse of children . . . a permanent record of the children's participation." *New York v. Ferber*, 458 U.S. 747, 759 (1982). This defendant no doubt spent countless hours searching, downloading, and viewing his treasured

16

collection, which further added to the humiliation, pain, harm, and abuse suffered by the little children in Nowicki's collection. Worse, he shared these images and videos to others, seemingly without qualification. The harm to these children is devastating, and lasts forever.

### E.  Adequate deterrence and protection of the public

Deterrence is a key component in discouraging future criminal behavior and protecting the public. By deterring both the individuals who create a demand for child pornography and those that produce the supply, courts can help prevent the sexual exploitation of children. The risk of reoffending is real, and demonstrated by this defendant. Congress envisioned that individuals like Nowicki, who seemingly have no ability to control their sexual desire for children, ought to be incarcerated for extended periods of time to protect society's children. The government agrees. A sentence of 40 years is appropriate.

### F.  Kinds of sentences available and the need to avoid unwarranted sentencing disparities.

Any case within the guidelines is presumed reasonable. Here, the Court cannot impose a sentence of life because of the statutory maximum of 50 years. Thus, anything below life is a downward variance.

A sentence of 40 years fits comfortably within the range of sentences that similarly situated defendants receive. Congress has decided that child pornography

17

crimes are serious, impart harm onto our children, and are deserving of lengthy sentences.

## III.   Conclusion

The government recommends a sentence of 480 months.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

s/ *Margaret M. Smith*
Deputy Chief, General Crimes Unit
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9135
E-Mail: margaret.smith@usdoj.gov
Bar No. P71413

Dated:  September 16, 2016

**Certificate of Service**

I hereby certify that on September 16, 2016, I electronically filed the

Sentencing Memorandum for the United States with the Clerk of the Court of the

Eastern District of Michigan using the ECF system which will send notification of

such filing to the following via electronic mail:

Rafael C. Villarruel
Attorney for Defendant
Email: Rafael_Villarruel@fd.org


s/ *Margaret M. Smith*
Deputy Chief, General Crimes Unit
Assistant United States Attorney